IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 18, 2008

Charles R. Fulbruge III
Clerk

No. 05-41347

KENNETH D. ROGERS; ANDREW DUNN; PAT H. COONE;
BETTY S. COONE; WAYNE D. BUTCHEE; CLINT L. HINES;
DAVID G. HINES; SYBIL K. JENKINS

Plaintiffs-Appellants

v.

ROBERT L. MCDORMAN; et al.

Defendants-Appellees

Appeal from the United States District Court
for the Eastern District of Texas

Before HIGGINBOTHAM, SMITH, and OWEN, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The former directors of Mauriceville National Bank (Directors) sued Robert McDorman, Meshell McDorman, Deon Thornton, and various McDorman-related business entities (Defendants), alleging violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) and state-law claims. Joe Penland was also a defendant. A jury found Defendants liable under RICO and some state-law theories, but only assessed damages for the RICO violations; however, the jury also found that Directors were in pari delicto with

Defendants. The district court entered a take nothing judgment against Defendants.

Directors appealed, principally challenging the in pari delicto defense and the finding that Penland was not liable. Penland cross-appealed. Prior to oral argument, Penland and Directors settled, dismissing their appeals against each other.[1] Directors maintained their appeal as to Defendants. For the reasons that follow, we affirm.

I

Robert McDorman held an ownership interest in an entity called MML, which owned two used car lots in east Texas, called "McDorman Motors." McDorman also held an ownership interest in a wholesale car company, RLM. McDorman and his businesses had a longstanding relationship with Mauriceville National Bank (MNB), a small Texas bank.

In December 1999, McDorman and Joe Penland formed a company called Mac-Pro, which began operating a car lot under the "McDorman Motors" name. Penland contributed capital and McDorman ran the day-to-day operations. In December 2000, with the businesses experiencing cash-flow problems, Penland agreed to make an additional capital contribution, and in exchange acquired greater ownership of the businesses. MML, RLM, and Mac-Pro were rolled into a new, enlarged Mac-Pro, in which Penland took an 85% ownership interest. McDorman continued to manage the day-to-day operations.

Beginning in October 2000, McDorman initiated a check-kiting scheme – which he considered a loan arrangement with MNB – to cover short-term financing gaps. The scheme moved money through MNB, Community Bank, and

---

[1] We, therefore, do not consider the issues raised by Directors that concern only Penland, nor do we consider any of the issues raised in Penland's cross-appeal.

SouthTrust Bank. The scheme was not, however, a typical check-kite, as it used cashier's checks and, more important here, MNB actively participated in it.[2]

The scheme followed a regular pattern. McDorman's wife, Meshell, would call MNB in the morning to check the balances in the Mac-Pro and McDorman Motors accounts. She would then have MNB prepare cashier's checks payable to Mac-Pro or McDorman Motors. A cashier's check is "[a] check drawn by a bank on itself";[3] it is an obligation of the bank that the bank is committed to honor, making it similar to cash.[4] Thus, normally, a customer must pay for a cashier's check when it is issued, such as by tendering cash or debiting an account at the bank. McDorman, however, did not do so. Rather, a runner would be sent to pick up the cashier's checks, which were then deposited in Mac-Pro and McDorman Motors accounts at Community Bank or SouthTrust Bank. The runner would "pay" for the cashier's checks with regular checks drawn on Mac-Pro and McDorman Motors accounts at MNB. MNB, however, would not immediately process the payment checks, but would hold the payment checks for processing on the next business day. This created a gap between when McDorman took possession of MNB funds and when he paid for the cashier's checks, allowing McDorman to belatedly cover the payment checks. The next day, the runner would deposit into Mac-Pro and McDorman Motors accounts at MNB regular checks drawn on accounts at Community Bank or SouthTrust

---

[2] According to Black's Law Dictionary, 231 (7th ed. 1999), check-kiting is "[t]he illegal practice of writing a check against a bank account with insufficient funds to cover the check, in the hope that the funds from a previously deposited check will reach the account before the bank debits the amount of the outstanding check."

[3] Id. at 230.

[4] See Cmty. Nat. Bank v. Channelview Bank, 814 S.W.2d 424, 427 (Tex. App.–Houston 1991) ("A cashier's check circulates through commerce as the equivalent of cash. A cashier's check is a bill of exchange drawn by the bank upon itself and is accepted in advance by the act of its issuance and is not subject to countermand by either its purchaser or the issuing bank. The bank's issuance of the check is acceptance of the check and constitutes an agreement by the bank to honor the check as presented.").

Bank to cover the previous day's payment checks. At the end of the scheme, it evolved to where McDorman was receiving the cashier's checks in the morning and the payment checks were not dropped off until the afternoon.

For the scheme to work, McDorman needed MNB's help, and he received it. Thornton, the then-president and CEO of MNB, directed MNB employees to assist McDorman. A number of employees prepared the cashier's checks, although Teresa Viator prepared most of them. The trial evidence indicates that other employees played a role in facilitating the scheme, such as the tellers who specially tracked and reported deposits into McDorman related accounts.

From October 2000 through early January 2001, more than $4 million was kited. The scheme temporarily ceased when bank auditors and examiners arrived at MNB in January. The scheme resumed in March 2001, and from then until its collapse on July 12, 2001, approximately $37 million more was kited.

In June 2000, Penland became concerned that McDorman had used Mac-Pro funds to pay personal debts. According to Penland, this prompted his decision to withdraw from Mac-Pro, although some evidence indicates that he wanted out because of the check-kiting. Penland officially transferred his ownership interest on July 13, but in the meantime required McDorman to fax to him each day copies of the checks written on the businesses' accounts.

Penland claimed that in early July he discovered suspiciously large checks being written by McDorman to MNB; he met with McDorman and learned of the scheme. McDorman, however, did not immediately stop the check-kiting. The scheme unraveled when Penland reported it to Community Bank on July 12, and Community Bank took steps to protect itself. Mac-Pro and McDorman Motors accounts at Community Bank were frozen, and Penland instructed McDorman to issue stop payment orders on Community Bank and SouthTrust Bank checks paid to MNB. A number of Mac-Pro and McDorman Motors debts – but not the amounts owed for the cashier's checks – were paid off after the scheme stopped.

MNB, unable to collect payment on the final cashier's checks, suffered some $3.3 million in losses and faced the prospect of failing. Federal regulators required Directors to recapitalize MNB for $2 million, enter a consent decree, and make periodic reports.

Throughout the check-kiting scheme, and before, MNB and McDorman had other banking and lending relationships. Car dealers like McDorman often use "sight drafts" to purchase cars. McDorman would frequently negotiate sight drafts to third parties, and occasionally MNB paid for the sight drafts with cashier's checks before McDorman paid for the cashier's checks. MNB's internal compliance officer, Donna Venable, thrice informed Directors about this. MNB also entered into an indirect lending agreement with McDorman, whereby MNB would purchase car loans from McDorman. Finally, MNB made various other loans to McDorman, for example, loaning $350,000 to help one of his businesses emerge from bankruptcy. Although the parties dispute the importance, and profitability, of McDorman as a customer to MNB, it is clear that McDorman was a significant customer.

MNB's claims against Defendants and Penland were assigned to Directors, and in July 2003, Directors brought claims under the civil provisions of RICO[5] and Texas law. The case was tried over twelve days. The jury found that 1) Penland was not liable for anything; 2) Defendants violated civil RICO, causing $3,374,256 in damages, and that they conspired to violate RICO but for zero damages; 3) Directors were in pari delicto with Defendants; 4) no defendants were liable for common-law fraud or conspiracy to commit fraud; and 5) the McDormans and Thornton were liable for constructive fraud but for zero damages. The district court entered a take nothing judgment.

II

---

[5] See 18 U.S.C. § 1964(c)-(d).

The principal issue in this appeal is the in pari delicto defense, which "derives from the Latin, in pari delicto potior est conditio defendentis: 'In a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one.'"[6] The defense embodies "the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct,"[7] and is undergirded by the concerns, "first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality."[8]

## A

We consider first a threshold question: whether Defendants properly raised in pari delicto. Directors point to Rule 8(c), which requires parties to plead affirmative defenses,[9] and argue that in pari delicto falls within the Rule's ambit, Defendants did not properly plead and raise the defense, and therefore Defendants waived it.[10]

While it is true that failure to abide by Rule 8(c) leads to waiver, there is some play in the joints. A defendant must "plead an affirmative defense with enough specificity or factual particularity to give the plaintiff 'fair notice' of the defense that is being advanced."[11] The concern is that "[a] defendant should not be permitted to 'lie behind a log' and ambush a plaintiff with an unexpected

---

[6] Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 306 (1985) (quoting Black's Law Dictionary 711 (5th ed. 1979)).

[7] Pinter v. Dahl, 486 U.S. 622, 632 (1988).

[8] Bateman Eichler, 472 U.S. at 306.

[9] See Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . .").

[10] See Pinto Trucking Serv., Inc. v. Motor Dispatch, Inc., 649 F.2d 530, 534 (7th Cir. 1981) (holding that the district court properly prevented defendants from raising in pari delicto for the first time at trial).

[11] Woodfield v. Bowman, 193 F.3d 354, 362 (5th Cir. 1999).

defense."[12] "Where the [affirmative defense] is raised in the trial court in a manner that does not result in unfair surprise, however, technical failure to comply precisely with Rule 8(c) is not fatal."[13] "More specifically, a defendant does not waive an affirmative defense if it is raised at a 'pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond.'"[14]

We agree that in pari delicto is an affirmative defense, but conclude that Defendants did not waive it. Their answers specifically raised Directors' conduct as an affirmative defense. For example, Penland's answer alleged that "[t]he injuries, damages, and losses alleged in the Original Complaint were caused in whole or in part by the acts or omissions of Plaintiffs, Plaintiffs' agents, and/or others," and that Directors had violated "the law, rules and regulations governing the operations of a national banking association." The McDorman Defendants' answer asserted that MNB knowingly participated in the scheme, and that Directors were "estopped from complaining about the transactions as, at a minimum, they knowingly allowed the transactions to occur to their benefit."[15] Penland's and McDorman's answers also both pled unclean hands. From the beginning, Directors knew that Defendants contended that they were involved in the scheme and their participation contributed to MNB's losses – in other words, that their conduct would form a basis of Defendants' defense.[16]

---

[12] Ingraham v. United States, 808 F.2d 1075, 1079 (5th Cir. 1987).

[13] Allied Chem. Corp. v. Mackay, 695 F.2d 854, 855-56 (5th Cir. 1983) (per curiam).

[14] Arismendez v. Nightingale Home Health Care, Inc., 493 F.3d 602, 610 (5th Cir. 2007) (quoting Lucas v. United States, 807 F.2d 414, 418 (5th Cir. 1986)).

[15] Directors' contention that Robert McDorman individually waived the defense is spurious. The footnote in the McDorman Defendants' answer on which they rely was an attempt to clarify that the check-kiting revolved around the business entities, that is McDorman was not "individually" kiting checks. The footnote cannot be fairly read as meaning that the affirmative defenses would not apply to him.

[16] See Bull's Corner Rest., Inc. v. Dir. of FEMA, 759 F.2d 500, 502 (5th Cir. 1985) (finding no waiver where defendant pled substance of policy exclusion as an affirmative defense

Moreover, Directors knew that in pari delicto itself was at issue, as they contested its applicability in a pretrial brief. During a pretrial hearing, the district court analyzed whether the defense was cognizable under civil RICO, ruling that it is.[17] The defense was raised at a "pragmatically sufficient time," and Directors cannot credibly claim they were surprised.

Directors contend that the district court's decision to allow in pari delicto "prejudiced" them because it led to the admission of circumstantial evidence in support of the defense that did not otherwise speak to the check-kiting scheme.[18] Directors misunderstand "prejudice" in this context: the prejudice inquiry considers whether the plaintiff had sufficient notice to prepare for and contest the defense, and not simply whether the defense, and evidence in support of it, were detrimental to the plaintiff (as every affirmative defense is). Directors tender no explanation of how Defendants' failure to plead in pari delicto more

---

even though the policy exclusion was not pled by name), superceded in part by rule on other grounds, Fed. R. Civ. P. 52(a).

[17] Compare Lubke v. City of Arlington, 455 F.3d 489, 499 (5th Cir. 2006) ("Regardless whether the City pled offset, however, both parties addressed the issue in their pretrial motions in limine. Lubke was on notice of the City's position and suffered no prejudice by the absence of a formal initial pleading."), reh'g denied, 473 F.3d 571 (5th Cir. 2006); Giles v. General Electric, 245 F.3d 474, 492 (5th Cir. 2001) (concluding the plaintiff was not "unfairly surprised" where the affirmative defense was addressed in the pretrial order and the court held a hearing on the issue pretrial), with Morris v. Homco Int'l, Inc., 853 F.2d 337, 343 (5th Cir. 1988) (finding waiver where the district court raised an affirmative defense "in drafting its opinion months after trial"); Ingraham, 808 F.2d at 1078-80 (concluding the Government waived a statutory defense by raising it for the first time after trial).

[18] Directors' discussion of the "prejudice" and "confusion" caused by Defendants' in pari delicto defense focused on waiver, and cannot be fairly read as appealing the district court's evidentiary rulings. Indeed, Rule 403 is not mentioned. See Fed. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). As such, Directors abandoned any "evidentiary" arguments. See, e.g., Askanase v. Fatjo, 130 F.3d 657, 668 (5th Cir. 1997) ("All issues not briefed are waived.").

formally prejudiced their ability to develop their case pretrial,[19] or hindered their ability to contest the defense at trial.[20]

B

Directors argued in their briefs that in pari delicto is not a defense to a civil RICO claim.[21] They explained that interpretations of RICO begin and end with the statute's text, which does not mention the defense; and that, as civil RICO liability turns on committing criminal RICO acts, principles of criminal jurisprudence should apply to civil RICO defenses and in pari delicto would not be a defense to a criminal RICO claim. However, during his oral argument rebuttal, Directors' counsel conceded, upon "mature reflection," that in pari delicto is a cognizable defense to civil RICO. We agree, and briefly explain why.

RICO provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains."[22] Section 1962, in turn, lays out the criminal prohibitions. Thus, civil RICO liability is dependent upon a defendant's committing criminal RICO acts. But neither civil RICO's textual silence nor its relationship with the criminal provisions is alone determinative of its contours.

For example, although civil RICO does not provide for a statute of limitations, the Supreme Court nevertheless held that civil RICO claims are

---

[19] See Pinto Trucking Serv., 649 F.2d at 534 (raising the defense at the "eleventh-hour" prevented plaintiff from taking discovery on the defense).

[20] Cf. Morris, 853 F.2d at 343 (explaining that "[the defendant] had no notice that the issue of [plaintiff's] substantial performance would be important in the litigation until the time had passed to meet the issue squarely").

[21] Although Directors also argue that in pari delicto does not apply to their common-law claims, we do not address the issue because of the jury's findings of either no liability or zero damages as to those claims.

[22] 18 U.S.C. § 1964(c).

subject to a four-year statute of limitations.[23] Nor has its silence prevented the application of a discovery rule governing when the statute of limitations begins to run,[24] or stopped the Supreme Court from suggesting that a civil RICO plaintiff may be able to invoke the doctrine of equitable tolling.[25] While, of course, the concerns animating statute of limitations issues are not the same as those here, the larger – and critical – point is that textual silence is often only the beginning, and not the end, of the inquiry;[26] it is often the predicate for interstitial federal common law.

The Supreme Court has also explained that different concerns underlie civil and criminal RICO. In rejecting the argument that criminal RICO's five-year statute of limitations should apply to civil RICO claims, the Court noted that the "'catchall' federal 5-year statute of limitations for criminal RICO actions does not reflect any congressional balancing of the competing equities unique to civil RICO actions or, indeed, any other federal civil remedy."[27] The Court subsequently reiterated, when confronting an argument that RICO's civil provisions should follow the criminal, that "there are significant differences between civil and criminal RICO actions, and this Court has held that criminal

---

[23] Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143 (1987).

[24] See Rotella v. Wood, 528 U.S. 549 (2000).

[25] See id. at 560-61 ("In rejecting pattern discovery as a basic rule, we do not unsettle the understanding that federal statutes of limitations are generally subject to equitable principles of tolling, and where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it, equitable tolling may be one answer to the plaintiff's difficulty . . . ." (citations omitted)).

[26] For example, courts have taken civil RICO's textual silence as an indication that Congress did not intend to displace background principles. See, e.g., Tafflin v. Levitt, 493 U.S. 455 (1990) (holding that, under the presumption of concurrent jurisdiction, Congress did not display an intent to deprive state courts of concurrent jurisdiction over civil RICO claims); Chappell v. Robbins, 73 F.3d 918, 923-25 (9th Cir. 1996) ("In passing RICO, Congress did not evince a 'clear legislative intent' to displace common-law immunities.").

[27] Agency Holding Corp., 483 U.S. at 155-56 (emphasis added).

RICO does not provide an apt analogy."[28] The Court's admonishment to consider "the competing equities unique to civil RICO actions" stands in contrast to the argument that RICO's civil provisions should follow lockstep its criminal provisions. Thus, though civil RICO may mirror the criminal provisions in some instances, any such determination must pay attention to civil RICO itself.

The Eleventh Circuit has considered whether in pari delicto is a defense to a civil RICO claim, holding that it is.[29] The court began by analyzing the Supreme Court's decisions in Bateman Eichler, Hill Richards, Inc. v. Berner[30] and Perma Life Mufflers, Inc. v. International Parts Corp.,[31] which considered the applicability of in pari delicto to securities and antitrust claims, respectively. Although the Court held that the defense was unavailable in each case, it was concerned that the defense would be used to defeat claims by persons who were not active participants in the violation of federal law.[32] Perma Life Mufflers did not foreclose a defense to an antitrust claim based on a plaintiff's "truly complete involvement,"[33] and Bateman Eichler explicitly recognized that in pari delicto

---

[28] Klehr v. A.O. Smith Corp., 521 U.S. 179, 188 (1997); see also Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 491 (1985) ("That the offending conduct [in civil RICO] is described by reference to criminal statutes does not mean that its occurrence must be established by criminal standards or that the consequences of a finding of liability in a private civil action are identical to the consequences of a criminal conviction.").

[29] Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145, 1152-56 (11th Cir.), cert. denied, Laddin v. Reliance Trust Co., 127 S. Ct. 45 (2006).

[30] 472 U.S. 299 (1985).

[31] 392 U.S. 134 (1968).

[32] See Official Comm., 437 F.3d at 1154 ("As in Perma Life Mufflers, the holding in Bateman Eichler was limited, because the Court concluded that the tippees were not active participants in the alleged violation of federal law.").

[33] See 392 U.S. at 140 ("We need not decide, however, whether such truly complete involvement and participation in a monopolistic scheme could ever be a basis, wholly apart from the idea of in pari delicto, for barring a plaintiff's cause of action, for in the present case the factual picture respondents attempt to paint is utterly refuted by the record.").

could be available in the securities law context.[34] The Eleventh Circuit, therefore, concluded that in pari delicto could apply to federal statutory claims, and derived the following guidance for its application:

> Under Perma Life Mufflers and Bateman Eichler, the application of the defense of in pari delicto to causes of action created by federal statutes depends on two factors: (1) the plaintiffs' active participation in the violation vel non and (2) the policy goals of the federal statute.[35]

The court then held that in pari delicto could apply to a civil RICO claim. The court explained that the plaintiff was not a passive participant in the fraudulent scheme giving rise to the lawsuit, but an active one. As the court noted, "[b]ecause federal RICO violations, as a matter of law, require affirmative wrongdoing rather than passive acquiescence, Perma Life Mufflers does not preclude the defense of in pari delicto in the RICO context."[36]

Nor would in pari delicto interfere with civil RICO's policy goals. The court explained that it would be "anomalous, to say the least, for the RICO statute to make racketeering unlawful in one provision, yet award the violator with treble damages in another provision of the same statute."[37] To allow co-conspirators to recover from each other would not, as the court pointed out, deprive violators of their ill-gotten gains, but would transfer the ill-gotten gains between them. Finally, the Eleventh Circuit rejected lower court decisions

---

[34] See 472 U.S. at 310-11 ("Accordingly, a private action for damages in these circumstances may be barred on the grounds of the plaintiff's own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public.").

[35] Official Comm., 437 F.3d at 1154.

[36] Id. at 1155-56.

[37] Id. at 1155.

12

holding that in pari delicto is not available to defend against civil RICO claims, as those opinions turned on misinterpretations of Perma Life Mufflers.[38]

We are persuaded by the Eleventh Circuit, adopt its analysis, and therefore hold that in pari delicto is a cognizable defense to a civil RICO claim.

C

Directors next argue that the district court erred by applying the Bateman Eichler formulation of in pari delicto – "as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress."[39] Directors argue that Bateman Eichler only established when the defense applies and not its content. Thus, they urge, this court's pre-Bateman Eichler version of in pari delicto – "mutual, simultaneous, and relatively equal" fault[40] – survives, and the district court erred by not using it.

Bateman Eichler went beyond merely establishing when in pari delicto is available; the Court also addressed the defense's substantive content. As the Court explained in Pinter v. Dahl, "The first prong of [the Bateman Eichler test] captures the essential elements of the classic in pari delicto doctrine."[41] Following the Court's lead, this court has applied Bateman Eichler's formulation of in pari delicto.[42] Directors' interpretation of in pari delicto is "outdated," as it fails to account for the Court's change of approach to in pari delicto wrought

---

[38] Id. at 1155-56.

[39] 472 U.S. at 310-11 (emphasis added).

[40] See, e.g., Woolf v. S.D. Cohn & Co., 515 F.2d 591, 604 (5th Cir. 1975).

[41] Pinter, 486 U.S. at 633.

[42] See In re Royale Airlines, Inc., 98 F.3d 852, 856 (5th Cir. 1996); Banc One Capital Partners Corp. v. Kneipper, 67 F.3d 1187, 1197 (5th Cir. 1995). Royale Airlines initially misquotes Bateman Eichler, see 98 F.3d at 855 (stating the test as "substantial responsibility"), but then properly states the Bateman Eichler standard, see id. at 856 ("where the plaintiff bore at least substantially equal responsibility," and "the plaintiff bears at least substantially equal responsibility" (emphasis added)).

by Bateman Eichler.[43]  The district court properly followed Bateman Eichler's "substantially equal responsibility" standard.[44]

Nor did the district court commit reversible error in its application of Bateman Eichler's second prong.  Directors argue that the district court failed to make the required case-specific finding that in pari delicto would not interfere with the effective enforcement of RICO and protection of victims.  Assuming such a responsibility exists, the district court fulfilled it.  The court addressed whether in pari delicto would interfere with civil RICO's policy goals during a pretrial hearing, concluding that it would not.[45]  By submitting the defense to the jury, the court affirmed its earlier ruling on the facts of this case.  Directors also argued in their post-trial motion that the district court failed to make the required policy analysis.  The court ruled that the defense did not interfere with RICO's goals, relying on its pretrial analysis and ruling.  The district court

---

[43] Peltz v. SHB Commodities, Inc., 115 F.3d 1082, 1090 (2d Cir. 1997) (rejecting a similar argument that a pre-Bateman Eichler in pari delicto standard should have been used).

[44] Directors have abandoned any arguments that the jury instruction or interrogatory wording impermissibly deviated from Bateman Eichler by not raising them.  See Askanase, 130 F.3d at 668 ("All issues not briefed are waived.").

[45] The district court explained: "Now, that leads to the second factor that is set out in the Bateman Eichler case, which is that preclusion of the suit would not significantly interfere with the effective enforcement of the laws and protection of the public. . . . In this case we're talking about RICO, which is designed to prevent and punish racketeering.  There doesn't seem to be an intent of Congress to allow one racketeer to sue another racketeer for civil damages claiming that the other racketeer should owe the first racketeer.  And, so, it doesn't seem that precluding a suit by one who is shown to be a racketeer from suing another would interfere with the policies or enforcement of the law.  There would still be [the] possibility of suits by plaintiffs who are less than substantially equally responsible – which would include even negligent, to my reading of the law, even negligent plaintiffs or plaintiffs who are slow on the uptake and, based on Bateman Eichler, even plaintiffs who had unclean hands. But when you get to substantially equally responsible, which, in effect, would mean they were also involved in the racketeering activity, precluding a suit by those people would not seem to significantly interfere with the effective enforcement.  The court also notes, of course, that innocent plaintiffs would still be able to sue; and, of course, the United States Government can sue or can enforce the law criminally."

addressed the policy ramifications of the defense three times, each time ruling the defense was permissible.

Nor have Directors convinced this court that the policy concerns underlying civil RICO preclude in pari delicto here. "Congress intended RICO's civil remedies to help eradicate 'organized crime from the social fabric' by divesting 'the association of the fruits of ill-gotten gains.'"[46] Allowing Directors to recover "under RICO would not divest RICO violators of their ill-gotten gains," rather it would let plaintiffs found by a jury to bear "substantially equal responsibility" for their injuries to recover damages; the check-kiting scheme could not work without MNB's active participation, and the jury found that Directors were active participants in the wrongdoing. This is not a situation where an innocent or passive victim is being deprived of a RICO remedy. We do not think Congress intended RICO to facilitate "a wealth transfer among similarly situated conspirators";[47] indeed, countenancing such a "wealth transfer" would, perversely, reward conspirators with treble damages – and that hardly seems to further RICO's deterrence goals.

D

Directors next challenge the sufficiency of the evidence. They properly moved for judgment as a matter of law, which is a challenge to the legal sufficiency of the evidence.[48] We review the district court's ruling on the motion

---

[46] Genty v. Resolution Trust Corp., 937 F.2d 899, 910 (3d Cir. 1991) (quoting United States v. Turkette, 452 U.S. 576, 585 (1981)).

[47] Official Comm., 437 F.3d at 1155.

[48] Flowers v. S. Reg'l Physician Servs., Inc., 247 F.3d 229, 235 (5th Cir. 2001).

de novo, applying the same standard of review as the district court.[49]  Boeing v. Shipman[50] defines our inquiry:

> Under Boeing, there must be a conflict in substantial evidence to create a jury question. Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions. Consequently, a mere scintilla of evidence is insufficient to present a question for the jury. Even if the evidence is more than a scintilla, Boeing assumes that some evidence may exist to support a position which is yet so overwhelmed by contrary proof as to yield to a [motion for judgment as a matter of law].[51]

We draw all reasonable inferences and resolve all credibility determinations in favor of the jury's verdict.[52]  "Thus, we will reverse, 'only if no reasonable jury could have arrived at the verdict.'"[53]

The evidence that Directors were in pari delicto is circumstantial, but it is sufficient to sustain the jury's finding.  Directors and Venable, the compliance officer, testified that they did not know about the scheme until it crashed, and a number of employees testified that they did not discuss the scheme with Directors.

The evidence shows that MNB was a small institution, employing approximately 15 people in the branch where the kiting occurred, the same branch where Directors held their board meetings.  Numerous persons were involved in the kite, including Thornton; the employees who prepared the

---

[49] Id.

[50] 411 F.2d 365 (5th Cir. 1969) (en banc), overruled on other grounds by Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir. 1997) (en banc).

[51] Gaia Techs. Inc. v. Recycled Prods. Corp., 175 F.3d 365, 374-75 (5th Cir. 1999) (quoting Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 993 (5th Cir. 1996) (en banc)).

[52] Miss. Chem. Corp. v. Dresser-Rand Co., 287 F.3d 359, 365 (5th Cir. 2002).

[53] Id. (quoting Snyder v. Trepagnier, 142 F.3d 791, 795 (5th Cir. 1998)).

cashier's checks; and other employees who provided collateral assistance. MNB employed special procedures for McDorman accounts. For example, the tellers specially tracked and reported deposits in McDorman accounts, information that was reasonably related to the scheme. The employees indicated that they did not hide what they were doing, and that McDorman never asked them to. The cashier's checks were paid out of a general cashier's checks account, and the evidence indicates that the cashier's checks used in the check-kiting were recorded in the cashier's checks log book, which indicated the check number, the amount, who it was going to, the date, and which employee issued it.

During the course of the kite, MNB issued more than 160 cashier's checks, totaling approximately $41.2 million. The amounts of the checks varied, but nearly all of the checks were for more than $100,000, and approximately half the checks were for more than $250,000; indeed, the first check was for $450,000. The amounts of the cashier's checks stand in contrast to the financial size of MNB, which was a small bank with a capitalization of around $3.5 million. A reasonable jury could conclude that it is implausible that the accounting irregularities the scheme would generate – the mismatch between debiting of the cashier's checks account and the deposit of payment – could go unnoticed; this inference seems especially strong given that other accounting irregularities involving McDorman, such as the cashier's checks involved with the sight drafts, were discovered and reported to Directors. And, there is evidence indicating that Directors engaged in at least some hands-on management at MNB, for example in their role on the Loan Committee. MNB's size, both physically and financially, casts doubt on Directors' claimed ignorance and supports an inference that it is unlikely the scheme could have been carried out without Directors' knowledge and approval.

While Directors attempt to place the blame on Thornton, there are a number of reasons to reject the contention that she authorized the scheme in a

rogue act. First, McDorman attended a meeting with the controlling block of the Directors and Thornton in February 2001, while the kiting was in hiatus. The main reason for the meeting was, apparently, to discuss whether McDorman might buy part of MNB. When asked whether there was discussion of the check-kiting, McDorman testified that "I thanked a couple of them whenever I talked to them, for letting me pay my stuff with cashier's checks; but we didn't go into any detail about anything at all pertaining to that." Although his testimony is ambiguous, at the least it demonstrates that McDorman himself broached the use of cashier's checks with some of the Directors, and more specifically suggests that McDorman was thanking them for special treatment. Shortly after this meeting, the check-kiting resumed.

Second, Thornton had worked at MNB for years, apparently without incident. One Director testified that he had known Thornton since 1963. The evidence indicates that Thornton had not attempted to hide other aspects of McDorman's relationship with MNB from Directors. Thornton's history with MNB undercuts the notion that she independently decided to authorize a check-kiting scheme. Venable's testimony about a meeting she had with Directors following the scheme's collapse bolsters this inference. Venable was principally speaking about her reports highlighting problems with the sight drafts. Venable read the following from her deposition without objection: "He [one of the Directors] said that it didn't matter what I had reported in those reports. They trusted Deon, and they didn't stop it." One implication of this, and the sight drafts, is that it is unlikely that Thornton was acting independently.

Third, and in some respects most striking, is what Directors did not do after the scheme collapsed. Viator, who prepared most of the cashier's checks, testified that none of the Directors ever asked her about what happened. Evelyn Carabin, who prepared the cashier's checks that led to MNB's losses, similarly testified that none of the Directors ever came to her to find out what happened.

That Directors never spoke with the employees who were directly involved in a scheme that nearly caused MNB to collapse supports numerous reasonable inferences related to Directors' involvement and knowledge.

Fourth, the jury heard testimony about the extensive business dealings between MNB and McDorman. The sight draft relationship, where MNB sometimes paid for sight drafts with cashier's checks for which McDorman had not yet paid, was quite revealing. Three separate reports by Donna Venable to Directors detailed that this was happening, and Venable testified that she told Directors personally during a board meeting in January 2001 that this was still occurring. Yet, according to her, Directors exhibited no surprise and asked no questions. As the district court noted, "It was uncontroverted that Thornton, with full knowledge of [Directors], was exceeding her lending authority in issuing cashier's checks to McDorman." Another employee, Kyle Armitage, wrote in a letter to Director Pat Coone that he "did have knowledge of McDorman's transactions from the reports [he] saw daily," referring to McDorman's overdraft problems, and that these problems were "well documented." Though these issues are distinct from the check-kiting, there are commonalities that belie the conclusion that MNB employees were independently helping McDorman with the check-kiting.

The evidence of the business dealings also addresses another puzzle in this case: why Directors would countenance a scheme that threatened MNB's financial integrity. There was testimony that MNB had modest profits during the relevant time-period. MNB had a number of banking and lending relationships with McDorman, and the jury could reasonably conclude that keeping and facilitating his business – even though the check-kiting itself may not have been profitable – were important to MNB's bottom line. The evidence also indicates that Directors had taken chances involving McDorman before, in particular the extent of the indirect lending arrangement, which eventually

concerned federal regulators, and the sight drafts. Despite the risks associated with McDorman, Armitage wrote in his letter that "at least one, and possibly more, Board members were considering increasing our relationship with [McDorman]."

Taken as a whole, and drawing all reasonable inferences and credibility questions in support of the verdict, the evidence is sufficient for a reasonable jury to conclude the Directors knew about and authorized the scheme. As MNB's active participation was a necessary component for the scheme to work, there was no reversible error in the jury's determination that Directors were in pari delicto with Defendants.[54]

Alternatively, Directors argue that, if they and MNB's employees were in pari delicto, then their actions and knowledge should not be imputed to MNB under agency principles because their interests were adverse to MNB.[55] This is important, they continue, because they are not advancing personal claims

---

[54] Directors argue that they had to be in pari delicto in the acts that actually caused the loss, the "end game," by which we understand them to mean the stop payment orders and other acts of Penland, McDorman, Community Bank, and SouthTrust Bank that prevented collection on the payment checks. In pari delicto, however, does not require that the plaintiff play a role in every aspect of the scheme or acts causing his loss – rather, Directors' recovery "may be barred on the grounds of [their] own culpability only where . . . as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress." Bateman Eichler, 472 U.S. at 310-11.

[55] Directors' assertion that federal law, as opposed to state law, governs the imputation of an agent's knowledge to its principal because RICO is a federal statute is not, to say the least, without difficulties. See O'Melveny & Myers v. FDIC, 512 U.S. 79 (1994); see also Nisselson v. Lernout, 469 F.3d 143, 154 & n.3 (1st Cir. 2006) ("We look to state law to ascertain when wrongful conduct should be imputed to a corporation."), cert. denied, 127 S. Ct. 2131 (2007). We need not wrestle with these difficulties, however, for the relevant Texas law dovetails with our cases applying agency imputation principles. Compare Askanase, 130 F.3d at 666 (stating the general imputation rule and adverse interest exception), with FDIC v. Ernst & Young, 967 F.2d 166, 170-71 (5th Cir. 1992) ("In Texas, whether an employee's fraud is attributable to a corporation depends on whether the fraud was on behalf of the corporation or against it."); Mays v. First State Bank of Keller, 247 S.W. 845 (Tex. Comm'n App. 1923, judgm't adopted) (recognizing the general imputation rule and the adverse interest exception); see also Goldstein v. Union Nat. Bank, 213 S.W. 584 (Tex. 1919); Kirby v. Cruce, 688 S.W.2d 161, 168 (Tex. App.–Dallas 1985).

against Defendants but rather are litigating MNB's claims as its assignees. In other words, MNB would not be in pari delicto and, as they stand in MNB's shoes, the defense should not bar recovery. We are not persuaded.

"Generally, courts impute a bank officer or director's knowledge to the bank unless the officer or director acts with an interest adverse to the bank."[56] The oddity in Directors' argument is that, after explaining in detail the adverse interest exception, they do not explain how their or MNB's employees' interests were adverse to MNB.[57] Viator's and Carabin's testimony establishes that they thought that they were working on MNB's behalf and for its benefit; and Directors' expert on check-kiting testified he saw no evidence that they, or Thornton, received bribes or kickbacks. Nor does the evidence show that Directors personally benefitted at MNB's expense, or had any other adverse interest. The evidence explains why Directors would authorize the scheme: McDorman was a big client, and keeping and growing his business was important to MNB. They took a calculated risk that backfired. As has been aptly noted, "Fraud on behalf of a corporation is not the same thing as fraud against it."[58] It cannot be, as Directors suggest, that they were acting adversely

---

[56] Ernst & Young, 967 F.2d at 170

[57] See Goldstein, 213 S.W. at 590 (asking whether "the agent's interests are so incompatible with the interests of his principal as practically to destroy the agency or to render it reasonably probable that an ordinary person, in the agent's position, under such circumstances, will neither act in behalf of his principal upon his so acquired knowledge, nor disclose that knowledge to his principal, but, because of such incompatibility in interests, will withhold such knowledge from the principal"); Restatement (Third) of Agency § 5.04 (2006) (explaining that "notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person").

[58] Greenstein, Logan & Co. v. Burgess Mktg., Inc., 744 S.W.2d 170, 190 (Tex. App.–Waco 1987) (quoting Cenco Inc. v. Seidman & Seidman, 686 F.2d 449, 456 (7th Cir. 1982)); see also FDIC v. Shrader & York, 991 F.2d 216, 223-24 (5th Cir. 1993) (examining the difference between fraud on behalf of a corporation and fraud against the corporation); Ernst & Young, 967 F.2d at 171 (discussing the same under Texas law).

simply because the scheme eventually hurt MNB.[59]   The evidence clearly supports a finding that MNB was in pari delicto in the scheme through the acts of its agents.

Directors' reliance on the Seventh Circuit's decision in Schacht v. Brown,[60] where the court did not impute the acts of a corporation's directors and managers to the corporation, is misplaced.  The Illinois Director of Insurance took over a failed insurance corporation as the statutory liquidator, and sued the defendants under RICO for their acts leading to the corporation's failure.  The defendants, relying on equitable estoppel, argued that their actions should be imputed to the corporation, their principal, and that because the Director of Insurance was asserting claims on behalf of the corporation, he should be precluded from asserting claims that the corporation would not be able to bring.  The court rejected this argument, drawing a distinction between fraud on behalf of the corporation and fraud targeted at the corporation.[61]  The corporation in Schacht "was, inter alia, fraudulently continued in business past its point of insolvency and systematically looted of its most profitable and least risky business and more than $3,000,000 in income–all actions which aggravated [the corporation's] insolvency."[62]  As the court summed it up, "[T]he prolonged artificial insolvency of [the corporation] benefitted only [its] managers and the

---

[59] See Restatement (Third) of Agency § 5.04 cmt. c (2006) ("However, for purposes of common-law agency, the fact that an action taken by an agent has unfavorable results for the principal does not establish that the agent acted adversely.").

[60] 711 F.2d 1343 (7th Cir. 1983).

[61] See id. at 1347 (explaining that "[t]he Cenco court limited its estoppel analysis to cases where 'the managers are not stealing from the company . . . but instead are turning the company into an engine of theft against outsiders.'"(quoting Cenco, 686 F.2d at 454)); id. at 1348 ("In no way can these results be described as beneficial to [the corporation].").

[62] Id. at 1347-48 (emphasis added).

other alleged conspirators, not the corporation."[63] The situation here clearly differs from that in Schacht; in short, trying to generate and develop business for the corporation is a far cry from looting the corporation's assets.

Accordingly, we conclude that there was sufficient evidence to support a jury finding that Directors – and MNB – were in pari delicto.

## III

Directors also argue that the district court erred in denying their motion for a new trial. We review a district court's denial of a motion for a new trial for abuse of discretion.[64] Directors assert three grounds: inconsistency in the verdict, the possibility of a compromise verdict, and the submission of the in pari delicto defense to the jury. We find no error.

The jury found that Defendants were liable under RICO, and assessed approximately $3 million in damages. The jury also found that they conspired to violate RICO and that the McDormans and Thornton committed constructive fraud, but the jury assessed zero damages for both of these actions. The jury found Penland not liable for anything, and found all of the defendants not liable for common law fraud.

"In determining whether [jury] answers are inconsistent, we look to 'whether the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted.'"[65] We will find inconsistency in the jury's answers "'only if there is no way to reconcile them,'" making "'a concerted effort to reconcile apparent inconsistencies in answers to special verdicts if at all

---

[63] Id. at 1348.

[64] Fiber Sys. Int'l, Inc. v. Roehrs, 470 F.3d 1150, 1167 (5th Cir. 2006).

[65] Id. (quoting FDIC v. Fid. & Deposit Co., 45 F.3d 969, 977 (5th Cir. 1995)).

possible.'"[66] "In attempting to reconcile special verdicts, our [Seventh Amendment] mandate to create consistency requires that we look beyond the face of the interrogatories to the court's instructions as well."[67]

This circuit, among others, has concluded that a finding of liability but no damages does not necessarily render a verdict fatally inconsistent.[68] The jury here was instructed that Directors had to prove damages and that Defendants' acts proximately caused those damages. The jury was further instructed to consider each of the Directors' claims and any resulting damages separately. This is not a case where the answers to two interrogatories are inherently in conflict. The district court explained that Directors' case suffered from a weakness of proof regarding damages, including "the amount of damages that arose from the various acts of Defendants," whether MNB in fact profited from its transactions with McDorman prior to the scheme's collapse, and how Community Bank's acts figured in to MNB's losses. As the court noted, "[t]he evidence concerning the loss to [MNB] was far from crystal clear." The weakness of proof is particularly acute as to the constructive fraud, and we note further that the jury's in pari delicto finding would render any inconsistency regarding the RICO conspiracy harmless. Thus, we agree with the district court that the zero damages awards can be understood to mean that Directors failed to carry their burden of proof.

---

[66] Id. at 1168 (quoting Willard v. The John Hayward, 577 F.2d 1009, 1011 (5th Cir. 1978), and Ellis v. Weasler Eng'g Inc., 258 F.3d 326, 343 (5th Cir. 2001)).

[67] Alverez v. J. Ray McDermott & Co., Inc., 674 F.2d 1037, 1040 (5th Cir. 1982).

[68] See Dairy Farmers of Am., Inc. v. Travelers Ins. Co., 391 F.3d 936, 945 (8th Cir. 2004) ("Even assuming the claim were not waived, a jury's finding of liability without a corresponding award of damages does not invalidate the verdict."); Zhang v. Am. Gem Seafoods, Inc., 339 F.3d 1020, 1036 (9th Cir. 2003) (noting that "the federal rule is that failure to award damages does not by itself render a verdict invalid" (quoting Philippine Nat'l Oil Co. v. Garrett Corp., 724 F.2d 803, 806 (9th Cir. 1984)); Wingartner v. Md. Cas. Co., 313 F.2d 754, 756 (5th Cir. 1963) (explaining the federal rule).

Directors also complain that it was inconsistent for the jury to find some of the Defendants liable under RICO, which was predicated on bank fraud, and not to also find those Defendants liable for common law fraud. Similar as RICO liability and common-law fraud liability may be here because bank fraud was the predicate RICO act, they are not the same and should not be conflated, and the jury was so instructed. The jury followed its instructions: it considered the claims separately and concluded that Directors proved one but not the other.

Nor was there a compromise verdict. "A compromise verdict occurs when a jury which is unable to agree on liability compromises that disagreement and awards inadequate damages."[69] In considering whether a jury compromised on a verdict, we consider "the 'totality of circumstances' and consider any indicia of compromise apparent from the record and other factors that may have caused a verdict for damages that would be inadequate if the jury actually found liability."[70] The verdict does not evince horse trading of damages for liability. The jury assessed damages for the RICO violation in the amount that Directors argued MNB directly lost from the check-kiting,[71] and again the evidence on damages was wanting.[72] The zero damages award reflects a failure of proof rather than a jury disregarding its instructions and compromising on the verdict.

---

[69] Pagan v. Shoney's, Inc., 931 F.2d 334, 339 (5th Cir. 1991).

[70] Yarbrough v. Strum, Ruger & Co., 964 F.2d 376, 379 (5th Cir. 1992).

[71] See id. ("It is inconceivable that the jury could find liability and then award damages for past but not future disfigurement, for past and future medical expenses but not for past and future pain and suffering, mental anguish, and lost earning capacity. [Defendant] did not dispute that [plaintiff] was seriously injured and that his injury would cause him impairment and disfigurement for the rest of his life.").

[72] Hatfield v. Seaboard Air Line R. Co., 396 F.2d 721, 723 (5th Cir. 1968) ("The verdict award of nominal damages in the teeth of an uncontroverted showing of substantial damages lacks any support in the record and cannot stand.").

Finally, Directors offer a number of arguments based on in pari delicto as justifying a new trial.[73] The district court properly allowed the defense and the evidence in support of it, and we are not persuaded that the jury was misled or confused. The district court did not abuse its discretion.

AFFIRMED.

---

[73] Directors' challenges to in pari delicto, which we addressed in Section II, were generally presented in the alternative: the alleged errors justified either judgment as a matter of law for Directors or a new trial. Directors also offered a stand-alone argument that the defense confused and misled the jury. We address all of these bases for a new trial here.