**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4746-18
      A-4805-18

W. CHARLES NIESSNER,
MADELYN K. NIESSNER, and
KEELEY LAKE LODGE LTD.
(1989),

  Plaintiffs-Respondents,

v.

RICHARD C. LUNEMANN,

  Defendant/Third-Party
  Plaintiff-Appellant/
  Respondent,

and

TIMOTHY CIMMER,

  Defendant-Appellant/
  Respondent,

and

JAMES SHARP,

  Defendant-Respondent,

and

JAMES KERBY, and
MACPHERSON LESLIE &
TYERMAN, LLP,

      Defendants,

v.

FUTURE NOW ENERGY, LTD.,
an Ohio Limited Partnership,
FUTURE NOW ENERGY, LLC,
an Illinois Limited Liability
Company, FUTURE NOW
ENERGY LIMITED
PARTNERSHIP, a Michigan
Limited Partnership,

      Third-Party Defendants.

_____

Submitted May 25, 2022 – Decided June 22, 2022

Before Judges Whipple, Geiger, and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-3587-15.

Kulzer & DiPadova, PA, attorneys for Timothy Cimmer, appellant in A-4746-18 and respondent in A-4805-18 (Eric A. Feldhake and Daniel L. Mellor, on the briefs).

Giansante & Associates, LLC, attorneys for Richard C. Lunemann, appellant in A-4805-18 and respondent in A-4746-18 (Louis Giansante, of counsel and on the briefs).

Lauletta Birnbaum, LLC, attorneys for respondents W. Charles Niessner, Madelyn K. Niessner, and Keeley Lake Lodge Ltd. (1989) (Gregory A. Lomax and Sarah Cohen, on the briefs).

Michael D. Ritigstein, attorney for respondent James Sharp.

PER CURIAM

These back-to-back appeals arise from a dispute over the ownership of plaintiff Keeley Lake Lodge Ltd. (1989) (the Lodge), a Canadian corporation, whose principal asset is a hunting and fishing lodge in Saskatchewan. Co-plaintiffs Charles Niessner and Richard Lunemann were both New Jersey citizens. Defendant Timothy Cimmer is a Canadian citizen residing in Saskatoon, and defendant James Sharp is a resident of Virginia.

The Lodge was incorporated in Canada in December 1988 with Niessner and an associate as its only shareholders. Initially, its property, located in northern Saskatchewan, was modest. When Niessner became its sole shareholder in June 1989, he made significant improvements. Around 1990, Lunemann began working as a guide for the Lodge, with the understanding, based on his discussions with Niessner, that he could eventually acquire an interest in the corporation through his efforts in expanding its business. He worked full-time to that end, though was formally paid at first by Machine

A-4746-18

Drywall Applicators, Inc. (Machine Drywall), a New Jersey company owned by Niessner.

In 1997, Canadian immigration authorities notified the Lodge that Lunemann required a work visa, which he did not have, to run hunting trips in Canada, which he had long been doing. With hunters soon arriving for a scheduled trip, Niessner and Lunemann sought advice from Canadian attorney and long-time Lodge counsel Benjamin Partyka, who advised them that the visa requirement did not apply to non-Canadian citizens who were majority owners of the Canadian companies for which they worked. On Partyka's advice, Niessner and Lunemann then executed a stock purchase agreement and promissory note (Purchase Agreement) purportedly memorializing a transfer of sixty shares of the Lodge stock from Niessner to Lunemann for CAD 60,000. Partyka purposefully backdated both documents to falsely represent that Lunemann was the majority shareholder since June 1990 and transferred the shares into escrow with his firm. The documents were presented to the Canadian immigration authorities, which accepted them as valid and issued no fines.

For years, Lunemann continued to work for the Lodge, the shares remained ostensibly in escrow, and payment was neither made nor requested. Along the way, Machine Drywall was dissolved in 2009 and ceased paying

Lunemann a salary, though the Niessners permitted him to continue living rent-free in a home they owned in Berlin, New Jersey, and added him as a joint owner of the Lodge's bank account in 2011. But the Niessners claimed that Lunemann began taking unauthorized withdrawals from the account, failing to remit funds he had collected from customers to the Lodge, and asserting that he in fact owned a majority interest in the company. This led to a falling out.

On September 30, 2014, the Niessners issued a demand for payment within thirty days for the full purchase price of Lunemann's shares under the Purchase Agreement. Partyka remitted a $60,000 check on Lunemann's behalf to Niessner on November 4, 2014, but, because it was five days late, Niessner demanded the release of the shares to him from escrow. Partyka refused, and further efforts among the parties at resolving the ownership dispute over the next year proved unsuccessful, ultimately resulting in this litigation. The Niessners and the Lodge filed a complaint against Lunemann for declaratory and other relief with respect to any interest he had in the Lodge.

Cimmer, who lived in Saskatchewan, knew both Lunemann and the Niessners, and had expressed interest in acquiring an interest in the Lodge in the past, met with Lunemann. Lunemann recommended Cimmer contact Sharp, a decades-long Lodge patron with a law degree, for assistance in dealing with the

lawsuit. Lunemann, on Sharp's advice, retained New Jersey counsel Giansante & Assoc., LLC (Giansante). Cimmer, who agreed to fund Lunemann's defense, wired a payment for Giansante's retainer and signed a surety agreement to guarantee any fees.

On December 11, 2015, Lunemann and Cimmer executed Loan and Option Agreements, which Canadian attorney James Kerby drafted on Cimmer's behalf. The Loan Agreement stated that Cimmer loaned Lunemann an initial sum of $5,000 representing the retainer, and provided that Cimmer would loan him additional funds, repayable within thirty days on written demand, on the conditions that he pledge all his shares in the Lodge as security and execute an acceptable option agreement with respect to those shares accordingly. Notably, the Loan Agreement further required that Lunemann promise he would not, without Cimmer's prior written consent, "transfer, assign[,] or otherwise dispose of, or attempt to dispose of, the [s]hares, or portion thereof," other than to Cimmer. The Option Agreement, in turn, provided Cimmer would have a ten-year option to purchase the shares at $200,000 on written notice, pursuant to certain requirements, and required that Lunemann promise that "there are not now, and during the term of this [a]greement there will not be, any other options, warrants or other rights or entitlements to purchase or acquire any of the [o]ption

6

[s]hares."

Yet, the Lodge's bylaws provided:

> 5. Shares in the [c]orporation's authorized capital may from time to time be allotted and issued, and options to purchase shares may be granted, by resolution of the [b]oard of [d]irectors on such terms and conditions and to such person or class of persons as the [b]oard of [d]irectors may determine.

Wes Bousquet, the Lodge's sole director at the time, made no such grant.

But, within three days, Bousquet passed a resolution repealing and replacing the bylaws, without substantial change in the above provision, and revising the quorum requirements for a shareholder meeting. At the following meeting on January 21, 2016, in Niessner's absence and despite his request that the meeting be cancelled or adjourned to allow time to work out any differences, Bousquet recognized Lunemann as the owner of the disputed shares. Lunemann, along with Cimmer, Sharp, and Thomas McKenzie, all of whom had been granted proxies by Lunemann, approved the new bylaws and elected Bousquet, Cimmer, and McKenzie as directors. Among other corporate governance changes made in the wake of that meeting, Cimmer sought signing authority for a bank account the Lodge held, resulting in a freezing of the account and the Niessners' funds therein.

The Niessners initiated an action in Saskatchewan against the Lodge,

A-4746-18

Cimmer, Lunemann, Partyka, McKenzie, and Bousquet for shareholder oppression and civil conspiracy on April 20, 2016, though Lunemann was dismissed once he and plaintiffs reached their initial settlement in the New Jersey litigation.

That settlement resulted from the Niessners and the Lodge participating in mediation and executing the handwritten Comprehensive Settlement Agreement (CSA) resolving all outstanding claims against Lunemann on July 29, 2016. In particular, the settlement was made with the understanding that the parties would later execute a CSA and release.

Conditioned on Lunemann satisfactorily securing cancellation of his loan with Cimmer, the CSA effectively provided for payment of a substantial sum to Lunemann in exchange for the reduction in his shares to thirty, representing a minority stake in the Lodge:

> 1. The . . . Lodge . . . shall redeem and then retire [thirty] shares of [its] stock presently in the name of . . . Lunemann, with such redemption being transacted as follows:
>
> > A. [The Lodge] shall pay to [Lunemann] the sum of $254,000 for [twenty] shares of [his] stock; and
> >
> > B. [The Lodge] shall forgive [Lunemann]'s loan payable to [the Lodge] in the amount of $105,560.50 in exchange for [his] return and the

redemption of [ten] shares of [Lodge] stock presently in [his] name . . . ; and

C. Of the $254,000 paid to [Lunemann] under [paragraph] 1A, [the Lodge] shall hold in escrow [approximately] $100,000 [the exact amount to be determined] to pay [his] loan obligation to . . . Cimmer . . . ; and

. . . .

E. The shares redeemed from [Lunemann] shall be retired and the [Lodge] shall take whatever measures necessary to reduce the number of [its] shares authorized from 100 to [seventy] shares.

However, on August 4, 2016, less than a week past the settlement, Kerby delivered a notice to Lunemann by email, on Cimmer's behalf, that Cimmer was exercising his option under the Option Agreement, and sent, for Lunemann to sign, a document explicitly providing for the transfer of sixty shares, which Lunemann no longer had. After Lunemann discussed the discrepancy with Sharp, Kerby modified the document to eliminate the specific reference to the number of shares. On August 7, 2016, Lunemann executed the document without notifying, much less consulting with, Giansante. Cimmer registered an ownership interest in all sixty disputed shares with the Saskatchewan Corporate Registry on August 12, 2016.

The Neissner/Lunemann CSA and release were never executed, and

A-4746-18

Lunemann's attempted transfer of shares in the Lodge to Cimmer prompted the Neissners to amend their complaint to add Cimmer, Sharp, and other parties as defendants, asserting claims against Lunemann for breach of contract and against the others for tortious interference. Lunemann filed an answer and third-party complaint on November 11, 2016, asserting various claims, including one against Cimmer and Sharp for tortious interference and another against Cimmer and third-party defendants—various entities allegedly associated with Cimmer and all sharing the name Future Now Energy (the Future Now entities)—for violations of Racketeering, N.J.S.A. 2C:41-1 to -6.2.

Cimmer, Sharp, and the Future Now entities all moved to dismiss in lieu of an answer. The court denied Cimmer's motion but granted the others and issued a pair of orders dismissing Sharp with prejudice and the Future Now entities without prejudice, leaving only plaintiffs, Lunemann, and Cimmer in the litigation.

Cimmer moved to reconsider, while plaintiffs and Lunemann each moved for partial summary judgment. The court denied Cimmer's motion, but granted the others in part, enforcing the CSA between plaintiffs and Lunemann, deeming the Option Agreement between Lunemann and Cimmer void ab initio, and holding Cimmer liable for tortious interference. The motion judge initially

10

issued an order purporting to memorialize that decision on April 24, 2017 but vacated it in favor of an order on May 8, 2017. Then, on plaintiffs' motion in aid of litigants' rights, the judge issued another order on June 16, 2017, reinstating some of the provisions from the vacated April 24 order.

Cimmer filed answers and cross-claims against plaintiffs and Lunemann on June 19, 2017. He also moved for a comity stay in favor of the Canadian litigation, which the trial judge denied on August 31, 2017.

All remaining issues were tried in 2018, and the court issued a written decision on January 30, 2019, holding Cimmer liable for tortious interference and Lunemann liable for breach of the CSA, and awarding damages accordingly.

In its written decision, the court concluded that Cimmer had treated Lunemann as a "pawn" in his "scheme . . . to obtain majority ownership of the Lodge" and was "obvious[ly] . . . not interested in simply getting his loan repaid," as had been explicitly arranged for under the CSA and had used Lunemann as an accomplice.

The court did not excuse Lunemann. It found he had brought the initial litigation upon himself, knew his ownership of the shares to have been a "sham," and, throughout the litigation, "played both sides to his advantage as he needed them." Consequently, the court permitted him little recovery beyond what he

was due under the initial settlement agreement, permitted Cimmer no recovery beyond repayment of his loan, and held both responsible for their harm to the Niessners in connection with this unjustifiably protracted dispute.

The court entered a final judgment memorializing that decision on February 21, 2019, and a supplemental order on February 27, 2019, confirming enforcement of the CSA, granting the Niessners reimbursement from both Cimmer and Lunemann for a collective $576,090.53 in attorney fees, and awarding the Niessners and Lunemann $20,000 and $5,000, respectively, in punitive damages against Cimmer. After further motion practice, the court issued a clarification order on May 23, 2019, authorizing the Niessners to set off the amounts Lunemann owed them under the judgment against the amounts he was owed under the CSA, and permitting his counsel a charging lien only on his resulting net recovery. Cimmer and Lunemann appealed.

Our review of a judgment following a bench trial is limited. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). A trial court's findings of fact are entitled to deference on appeal so long as they are supported by sufficient credible evidence in the record. Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 483-84 (1974). Such deference is particularly appropriate where those findings depend on credibility evaluations made after a

full opportunity to observe the witnesses testify, <u>Cesare v. Cesare</u>, 154 N.J. 394, 412 (1998), or on the court's "'feel' of the case," <u>State v. Johnson</u>, 42 N.J. 146, 161 (1964). The court's "interpretation of the law and the legal consequences that flow from established facts," however, "are not entitled to any special deference," and are subject to de novo review on appeal. <u>Manalapan Realty, L.P. v. Twp. Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995). We address each appeal in turn.

I.

<u>Cimmer's Appeal</u>

<u>A. Comity Stay</u>

Cimmer first argues that the court abused its discretion in denying his motion for a comity stay in favor of the Canadian litigation. We disagree.

Comity is an equitable doctrine providing that the court that first acquires jurisdiction over a dispute has precedence in adjudicating it "in the absence of special equities." <u>Sensient Colors Inc. v. Allstate Ins. Co.</u>, 193 N.J. 373, 386 (2008) (quoting <u>Yancoskie v. Del. River Port Auth.</u>, 78 N.J. 321, 324 (1978)). Ordinarily, when addressing a motion for a stay on this ground, a trial court will accord a presumption in favor of the forum of the first-filed action, provided that the cases involve substantially the same parties, claims, and legal issues,

and that the plaintiff in the later-filed action has an opportunity for relief in the first jurisdiction. Id. at 387, 390. But the movant first bears the burden of making a prima facie showing of these factors. Id. at 393. Once that burden is satisfied, the opposing party may overcome the resulting presumption in favor of a stay only by demonstrating the presence of one or more special equities—that is, "reasons of a compelling nature that favor the retention of jurisdiction by the court in the later-filed action" on the ground that the "first-filed action may not do full justice to a party." Id. at 387, 392-93. The court's decision whether to grant the stay lies within its sound discretion and will be reviewable only for an abuse of that discretion on appeal. Id. at 390.

The court declined to grant a comity stay after acknowledging that claims specifically relating to Cimmer were filed in Canada before any were filed against him in this litigation, but this litigation had nonetheless been formally instituted first. Moreover, the actions were not congruent with respect to their parties, claims, or issues. The Canadian action, the court recounted, was for shareholder oppression and included parties that were not involved in the New Jersey action. The New Jersey action, meanwhile, entailed claims that did not relate to the Lodge or its corporate structure or management, including those against Lunemann for recovery of unpaid rent and various personal loans.

14

There was no apparent reasonable justification for staying resolution of the only remaining issue here, damages, until the court in Canada made its determination on unrelated issues. The core issues in this litigation had already been resolved, and none of the existing claims in the Canadian litigation had any bearing on resolution of what remained.

## B. Option Agreement

Cimmer next argues the court's conclusion on summary judgment that his Option Agreement with Lunemann was void ab initio was error. He contends the court decided the issue before he had an adequate opportunity for discovery, failed to apply Saskatchewan law, and erred in its interpretation of the implications for the Option Agreement, of the Lodge's articles of incorporation and bylaws, Lunemann's share certificate, and the CSA. We reject these arguments.

The basic requirements of a valid, enforceable contract are mutual agreement by offer and acceptance, and a sufficient particularity in terms such "that the performance to be rendered by each party can be ascertained with reasonable certainty." Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992) (quoting W. Caldwell v. Caldwell, 26 N.J. 9, 24-25 (1958)). Moreover, there must be a "flow of consideration—both sides must 'get something' out of the

exchange." Cont'l Bank of Pa. v. Barclay Riding Acad., Inc., 93 N.J. 153, 170 (1983).

Even an otherwise valid contract satisfying these criteria may be deemed void if contrary to public policy, E.B. v. Division of Medical Assistance and Health Services, 431 N.J. Super. 183, 199 (App. Div. 2013), or for circumstances such as fraud or mistake, see Dunkin' Donuts of America, Inc. v. Middletown Donut Corp., 100 N.J. 166, 183 (1985). Pertinent here, a party generally cannot convey a greater interest in property than he or she has. See Phoenix Pinelands Corp. v. Davidoff, 467 N.J. Super. 532, 619 n.41 (App. Div. 2021).

Moreover, to the extent the issue turns on interpretation of the option or related agreements or the Lodge's bylaws, the touchstone for interpretation of a contract is the parties' shared intent in reaching the agreement. Pacifico v. Pacifico, 190 N.J. 258, 266 (2007). So long as that intent is evident from the contract's clear, unambiguous terms, the agreement will be enforced as written. Karl's Sales & Serv., Inc. v. Gimbel Bros., Inc., 249 N.J. Super. 487, 493 (App. Div. 1991). To the extent of any ambiguity, that is, when "a contractual term is susceptible of more than one reasonable interpretation . . . a court may discern the parties' intent from evidence bearing on the circumstances of the agreement's

formation . . . and of the parties' behavior in carrying out its terms." EQR-LPC Urban Renewal North Pier, LLC v. City of Jersey City, 452 N.J. Super. 309, 319 (App. Div. 2016) (citations omitted). The same principles apply to interpretation of corporate bylaws pursuant to Delaware authority, Hill Int'l, Inc. v. Opportunity Partners, 119 A.3d 30, 38 (Del. 2015), which our courts generally follow on matters of corporate law, see Pogostin v. Leighton, 216 N.J. Super. 363, 373-74 (App. Div. 1987).

We interpret a contract de novo. Kieffer v. Best Buy, 205 N.J. 213, 222 (2011). "Accordingly, we pay no special deference to the trial court's interpretation and look at the contract with fresh eyes." Id. at 223.

Here, there was no issue of material fact in interpretation of the CSA subject to genuine dispute. It was clear, specific, and detailed, leaving the parties with a settled case and the responsibility for carrying out the agreement. Because Lunemann unambiguously received only thirty shares in the Lodge pursuant to that agreement, he could not have transferred any greater number to Cimmer.

The Lodge's bylaws did not provide Lunemann the ability to transfer even that. The "very clear language . . . dictated that the options could only be granted upon passage of a [b]oard resolution," and the board had passed no such

17

resolution. The court acknowledged that Lunemann could, with appropriate board approval, transfer his shares to Cimmer or anyone else going forward. But there was no legitimate material factual dispute with regard to the validity of the existing purported transfer and underlying Option Agreement that would preclude resolution of those issues as a matter of law.

Cimmer argues the court should not have resolved the issue on summary judgment without permitting him a prior, adequate opportunity for discovery. To defeat a motion for that relief, the non-prevailing party must demonstrate the need for further discovery by explaining "with some degree of particularity the likelihood that [the] discovery will supply the missing elements" of a claim or defense and therefore influence the outcome of the litigation. Wellington v. Est. of Wellington, 359 N.J. Super. 484, 496 (App. Div. 2003) (quoting Auster v. Kinoian, 153 N.J. Super. 52, 56 (App. Div. 1977)).

In opposition to the summary judgment motions, Cimmer argued there were material factual disputes with regard to the validity of the CSA as a binding agreement and interpretation of the unsigned corporate bylaws and that it was unfair to require a party newly introduced to the litigation to take the other parties' certifications at face value without permitting him an opportunity to first explore their reliability in the discovery process.

However, Cimmer did not specify what information he expected to find through such discovery or that it would have aided him in defending against the grant of summary judgment. The Lodge's articles of incorporation did not explicitly forbid the use of options by shareholders in transferring shares of stock in the Lodge; Niessner and Lunemann executed the Purchase Agreement to evade immigration issues related to Lunemann's employment; the 2015 bylaws, formally approved three days after Lunemann executed the Option Agreement, contained a provision identical to the one at issue in the 1989 bylaws; Partyka drafted the 1989 bylaws and the Purchase Agreement and advised Niessner and Lunemann to enter into that agreement; and Bousquet accepted the same shares later pledged to Cimmer as collateral for a personal loan he made to Lunemann in 2014 and still claimed a security interest in them.

None of this information would have sustained Cimmer's burden. Although the articles of incorporation do not explicitly limit the use of options by shareholders, they are broadly consistent with the 1989 bylaws in providing that "[n]o shares of the corporation shall be transferred without approval of the majority of Class A shareholders." Likewise, the 2015 bylaws, which were not approved until after execution of the Option Agreement, merely contained the same provision from the 1989 bylaws, of which Cimmer was already aware and

A-4746-18

on which the court relied, considered unambiguous, and interpreted accordingly.

Cimmer next faults the court for not applying Saskatchewan law in evaluating the validity of the Option Agreement in light of the Lodge's governing instruments. The threshold inquiry as to a choice of law is "whether the laws of the [jurisdictions] with interests in the litigation are in conflict." McCarrell v. Hoffman-La Roche, Inc., 227 N.J. 569, 584 (2017). Where application of either jurisdiction's laws produces the same outcome, there is no conflict, and the law of the forum may govern. Ibid. In the event of a conflict, on the other hand, the choice of law depends on weighing the interests each state has in the resolution of each issue in dispute and should be made on an issue-by-issue basis. Rowe v. Hoffman-La Roche, Inc., 189 N.J. 615, 621-22 (2007).

Cimmer asks us to recognize that the Option Agreement explicitly provided that it would be governed by Saskatchewan law, and that the Lodge was a Saskatchewan corporation also governed by the law of that province. But Cimmer did not raise this at the trial court, and we need not consider it for the first time on appeal. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973). Moreover, Cimmer identifies no conflict between Saskatchewan and New Jersey law in pertinent respect that would have rendered any error in the court's choice of law harmful.

20

## C. Loan Agreement

Cimmer next argues the court erred in concluding his Loan Agreement with Lunemann was void ab initio and, consequently, that Lunemann was not in breach of contract. Although the court deemed the agreement void ab initio, it still ordered Lunemann to repay Cimmer the money Cimmer had loaned to him for his defense. Moreover, it granted the Niessners a setoff for that purpose from the sum they owed Lunemann under the CSA, and ordered the parties to comply with that agreement, which explicitly required that adequate funds be held in escrow to effectuate the repayment.

Cimmer maintains he was prejudiced by the decision because it deprived him of a defense to the tortious interference claim and foreclosed Lunemann's liability for breach of the Loan Agreement. But, his defense to the tortious interference claim was already undermined by the invalidity of the Option Agreement, and he did not identify any damages he could have recovered for breach of contract beyond repayment of the loan, which the court already ordered be paid. Any error in deeming the Loan Agreement void would therefore have been harmless, see Willner v. Vertical Reality, Inc., 235 N.J. 65, 80-81 (2018), and we need not consider the issue further.

A-4746-18

## D. Enforcement of the CSA

We also reject Cimmer's argument that the court's decision to enforce plaintiffs' and Lunemann's settlement was premature because Cimmer had not yet had any opportunity to engage in discovery to explore his defense of unclean hands on plaintiffs' and Lunemann's part. As we have already said, Cimmer did not demonstrate the need for further discovery "with some degree of particularity the likelihood that [the] discovery will supply the missing elements" of a claim or defense and therefore have some consequence to the outcome of the litigation. Wellington, 359 N.J. Super. at 496 (quoting Auster, 153 N.J. Super. at 56).

Nonetheless, the enforceability of a settlement or other agreement, at least in the context of a demand for specific performance, remains a matter of equity. Ballard v. Schoenberg, 224 N.J. Super. 661, 668 (App. Div. 1988). A court may refuse equitable relief to a party who comes to the court with "unclean hands"— that is, to one who has engaged in "bad faith, fraud[,] or unconscionable acts" in the relevant "underlying transaction." Pellitteri v. Pellitteri, 266 N.J. Super. 56, 65 (App. Div. 1993). Whether a court refuses relief on that ground is a matter entrusted to its sound discretion, guided by its consideration of the "effect of the inequitable conduct on the total transaction," Untermann v. Untermann,

22

19 N.J. 507, 518 (1955), and with the aim of fostering justice, rather than of punishment, Pellitteri, 266 N.J. Super. at 65.

Here, the court did not explicitly address the unclean hands doctrine in its initial decision on the enforceability of the CSA at the summary judgment stage. But it made clear in its opinion after trial that the doctrine "cut[] both ways" in Cimmer's case, explaining that he could not, consistent with the doctrine, invoke his agreement with Lunemann to enforce the transfer of shares, when he had entered into the agreement knowing that the shares had been "granted" to Lunemann in the first place only as a sham.

Cimmer asserts that the CSA was designed with the deliberate purpose of interfering with his rights under the option and loan agreements and the equities are on his side because Niessner and Lunemann backdated their Purchase Agreement and falsified corporate books and public records to defraud the Canadian immigration authorities. The admissions and trial evidence he cites may well demonstrate that plaintiffs and Lunemann had unclean hands, but it does so with respect to their initial arrangement, not with respect to the CSA that was the focus of the summary judgment motion.

### E.  Plaintiffs' Motion in Aid of Litigants' Rights

Cimmer next argues that the court abused its discretion in issuing the June

A-4746-18

2017 interlocutory order granting plaintiffs' motion in aid of litigants' rights.  He contends that plaintiffs brought the wrong sort of motion to obtain the relief granted in three paragraphs of the order and demands reversal of those specific provisions.  But the final judgment directly or effectively enjoins all the same conduct or imposes the same obligations.  Because reversal of the interlocutory order would therefore have no practical consequence, the point is moot. Betancourt v. Trinitas Hosp., 415 N.J. Super. 301, 311 (App. Div. 2010).

### F.  Tortious Interference

Cimmer next contends the court erred in finding him liable for tortious interference with performance of the CSA.  We reject this argument.

A party claiming tortious interference with a prospective economic advantage must demonstrate: (1) a "protectable right" in the form of a "prospective economic or contractual relationship," (2) interference with that right "done intentionally and with 'malice,'" that is, "without justification or excuse," (3) "loss of the prospective gain" from the relationship, and (4) causation of that loss by the act of interference.  Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 751-52 (1989).  A determination of whether given conduct is improper pursuant to that standard is fact-specific.  Lamorte Burns & Co. v. Walters, 167 N.J. 285, 306 (2001).  It requires "an evaluation of

the nature of and motive behind the conduct, the interests advanced and interfered with, societal interests that bear on the rights of each party, the proximate relationship between the conduct and the interference, and the relationship between the parties." Nostrame v. Santiago, 213 N.J. 109, 122 (2013). Generally, conduct must be "both 'injurious and transgressive of generally accepted standards of common morality or of law'" to qualify. Lamorte Burns, 167 N.J. at 306 (quoting Harper-Lawrence, Inc. v. United Merchs. & Mfrs., Inc., 261 N.J. Super. 554, 568 (App. Div. 1993)).

Here, Cimmer was not a party to the CSA and consequently had no obligation to fulfill its terms by cancelling the Loan Agreement, and Lunemann's shares were the only purported collateral for the loan. But his conduct to acquire such an interest in this instance was improper because he interfered with performance of the CSA and did so intentionally and maliciously. He knew that Lunemann's prior arrangement with the Niessners was a sham and could therefore not reasonably rely on Lunemann's shares as collateral for the loan because Lunemann could not pledge what he did not own.

Yet Cimmer exercised his option immediately after learning Lunemann had entered into the CSA, the terms of which Cimmer was fully aware and, together with Sharp, put "undue pressure" on Lunemann to convince him to

renege on the CSA, eroding his trust in the Niessners and persuading him to ignore his own counsel in favor of Sharp, whom he was told was acting in his best interest. Knowing that Lunemann did not actually have sixty shares to transfer, Cimmer then dishonestly had the transfer document revised to remove reference to any specific number and had his attorneys fraudulently register him as owner of the disputed shares in the Saskatchewan Corporate Registry. Moreover, he had entered the Option Agreement at a time he knew Lunemann to be distressed about having to fund this litigation and, in the end, never even released from escrow the remainder of the exercise price he admittedly owed Lunemann under the agreement.

Cimmer asserts that his exercise of the option was justified because he reasonably believed he had a protectable interest. He asserts that, even if the agreement was void, he could not have known that fact when he exercised the option. He reasons that, at time of settlement, "both the Niessners and Cimmer reasonably believed they had contractual rights to the same shares," and "[b]oth were aware of the contracts underlying each other's rights." He had exercised his option merely to protect his own legitimate interests; yet, only he was held liable for tortious interference, even though the Niessners were no less guilty of interference with his contract. Moreover, even if Lunemann's interest in the

A-4746-18

shares that were the subject of that contract had always been a sham, he contends it was unfair to likewise hold that fact solely against him, all while excusing the actual parties to the sham arrangement.

But the purpose of holding Cimmer liable here was not to punish him or anyone else for the sham arrangement. That remains the prerogative of the Canadian government. The arrangement entered the inquiry on tortious interference only because Cimmer's knowledge of it, which the court found with a full opportunity to observe his testimony and evaluate his credibility, Cesare, 154 N.J. at 412, precluded the notion that he reasonably believed he was exercising the option pursuant to a legitimate agreement. His dishonest behavior in having the transfer revised and the shares recorded lends further support for the court's ultimate conclusion.

### G. Counsel Fees as Compensatory Damages

Cimmer next argues that the compensatory damage award was contrary to law insofar as it reimbursed plaintiffs for counsel fees they incurred in this action after plaintiffs' and Lunemann's claims against each other had already been resolved.

Our courts generally adhere to the American Rule, which holds each party responsible for its own attorney fees, Rendine v. Pantzer, 141 N.J. 292, 322

(1995), but a court may grant a fee award to a prevailing party to the extent specifically permitted by law or agreement, Mason v. City of Hoboken, 196 N.J. 51, 70-71 (2008). Plaintiffs here sought reimbursement of their attorney fees on several grounds, but the one the court explicitly addressed and accepted was an exception to the American Rule for third-party litigation,[1] which provides that:

> One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.
>
> [DiMisa v. Acquaviva, 198 N.J. 547, 554 (2009) (quoting Restatement (Second) of Torts § 914(2) (Am. Law Inst. 1979)).]

The fees incurred in the other litigation thus effectively constitute another element of "damages flowing from the tort." Ibid. (quoting State, Dep't of Env't Prot. v. Ventron Corp., 94 N.J. 473, 505 (1983)).

In our view, where, as here, recovery of attorney fees is permissible, the decision whether and in what amount to grant an award rests within the trial

---

[1] Although the court mentioned in its opinion that the punitive damage award would reflect a reimbursement of "some" of plaintiffs' attorney fees and later reiterated plaintiffs' entitlement to punitive damages in the midst of addressing the attorney fee issue, it designated the fee award as an element of compensatory damages in its order and explicitly invoked only this authority in reaching that award in its opinion.

court's sound discretion.  Desai v. Bd. of Adjustment of Phillipsburg, 360 N.J. Super. 586, 598 (App. Div. 2003).  A fee award "will be disturbed only on the rarest of occasions, and then only because of a clear abuse of [that] discretion." Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001) (quoting Rendine, 141 N.J. at 317).

Here, the court concluded, on the one hand, that Cimmer's tortious interference with the CSA had prolonged plaintiffs' dispute with Lunemann, and, on the other, that Lunemann's breach of contract necessitated the litigation against Cimmer, causing the Niessners to incur attorney fees on both fronts well beyond the settlement of the initial litigation.  Nonetheless, it reasoned that, because there had been no clear determination as to the respective rights of the parties and enforceability of the CSA until the May 8, 2017 order disposing of the summary judgment motions, plaintiffs should only be able to recover their attorney fees from that point forward.  Moreover, after reviewing the relevant billing, it found that certain charges for reviewing the firm's own invoices were excessive, but that the balance of disputed fees, including the billing increments, were reasonable.  In its final order, it apportioned three quarters of the $576,090.53 adjusted total to Cimmer and one quarter to Lunemann, "based on [their respective] degree of culpability" for the extended litigation.

Cimmer disputes the legal authority for that award, arguing that the court applied the third-party exception incorrectly because the exception only covers fees incurred against a third party—in his case, Lunemann. While he concedes he could be liable under that exception for reimbursement of the bulk of plaintiffs' fees incurred prior to the May 2017 order, when they were still actively prosecuting their claims against Lunemann, he asserts that, once the May 2017 order was issued, plaintiffs' claims against Lunemann were largely resolved, leaving them all "on the same side" against him and the third-party exception no longer applicable.

But that is not the case. Plaintiffs continued to prosecute their successful claim for breach of contract against Lunemann after that point and seek both compensatory and punitive damages, including the attorney fees now at issue. The third-party exception therefore remained viable against Cimmer. The court's award was consistent with the law and within its discretion in the challenged respect, and Cimmer's arguments to the contrary present no grounds for reversal.

## H. Allocation of Receiver's Fees

Finally, Cimmer challenges the allocation to him of any responsibility for the fees billed by the Lodge's custodial receiver. Again, we reject this argument.

A-4746-18

Generally, a court of equity exercises broad discretion in fashioning remedies to fit the circumstances of each case. Salorio v. Glaser, 93 N.J. 447, 469 (1983). Its decisions in that regard will be subject to review on appeal only for an abuse of that discretion. See Sears Mortg. Corp. v. Rose, 134 N.J. 326, 354 (1993). In particular, that discretion includes those allocating responsibility among the parties for fees of court-appointed experts or other professionals. See Platt v. Platt, 384 N.J. Super. 418, 429 (App. Div. 2006) (as to expert fees).

Here, the court appointed the receiver in September 2016 in connection with impounding the shares subject to dispute in the initial litigation and, at the time, ordered that the receiver's fees be paid by the Lodge. Over the course of the litigation, the receiver billed for his services a total of $39,102.58, which the Niessners loaned to the Lodge to pay. In its final judgment, with the benefit of all the evidence at trial, the court determined that, in addition to any damages or sanctions otherwise awarded, Cimmer and Lunemann should each reimburse the Niessners one third of that sum, $13,034.19.

The initial allocation was the subject of an interlocutory order, which the court had the discretion to reconsider and modify at any time prior to final judgment. Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 257 (App. Div. 1987). Once it did revisit the issue, its decision to allocate an equal portion

31

of the fees to Cimmer in light of his prominent role in prolonging the dispute was adequately supported by the record, Rova Farms Resort, 65 N.J. at 483-84, and well within its discretion, Sears Mortg. Corp., 134 N.J. at 354.

As for the total time billed, the court's conclusion that it was reasonable finds adequate support in the invoices and testimony from plaintiffs' expert elucidating them. Rova Farms Resort, 65 N.J. at 483-84. Worthy of note is that the court did reduce the related attorney's fee award to exclude superfluous time expenditures, demonstrating that it did not reflexively accept invoices submitted for reimbursement at face value, but subjected them to the appropriate scrutiny. Cf. Rendine, 141 N.J. at 335 (requiring "careful[] and critical[]" evaluation of applications for attorney fees).

## II.

### Lunemann's Appeal

### A. Dismissal of Sharp and the Future Now Entities

In his appeal, Lunemann argues error in the court's dismissal of his claims against Sharp and the Future Now entities for lack of personal jurisdiction, and asks to remand the matter for reinstatement and severance of these claims, so that he may pursue them without inhibiting enforcement of the existing judgment in the Canadian courts. Although the final record does provide some

basis for the exercise of personal jurisdiction over at least Sharp, the issue is, in any event, moot.

Lunemann's position was that Sharp tortiously interfered with the CSA by giving him unauthorized legal advice contrary to his interests, on which he relied to violate the agreement, and taking other actions in cooperation with Cimmer to otherwise undermine the agreement. Yet many of the actions he outlined on Sharp's part in his certification in opposition to this motion were either innocuous or occurred prior to the settlement.

With respect to the CSA, Lunemann claimed Sharp thoroughly reviewed that document with him, as well as explaining its legal ramifications, telling him that the settlement might not yet have been final, and advising him not to sign any further paperwork regarding it. He added that, after the Niessners requested a follow-up conference, Cimmer advised him to call Sharp for advice to "figure out what to say and do during [the] meeting," though he failed to even confirm in his certification that he actually did so, much less provide any specifics as to the substance of any resulting conversation.

As to the transfer of shares, Lunemann asserted that Cimmer and Sharp had Kerby prepare the initial notice and that Sharp had Kerby redraft it to remove the reference to the number of shares after speaking with Lunemann,

though Lunemann did not indicate the basis of his personal knowledge of any of these actions on Sharp's part outside the context of the phone calls. Lunemann stated that Sharp then counseled him to sign the document transferring the shares, while "fail[ing] to advise [him] that executing the document was against [his] interests," and admitted that he signed it "without contacting [his] New Jersey attorney or seeking legal advice other than that offered by . . . Kerby and Sharp." He recounted further that Sharp persuaded him to execute the proxy for purposes of the shareholders' meeting and told him that the steps Bousquet was taking were in his best interest.

Lunemann explained that he trusted Sharp and thought he was a competent attorney acting in Lunemann's best interests, but now believed that Sharp's actions were instead geared toward aiding Cimmer in his acquisition of majority control of the Lodge. Lunemann certified that, in all, he and Sharp had spoken on the telephone about twenty-five times for a total of 10.53 hours, during which they had "lengthy discussions about the events unfolding in New Jersey." In that regard, he claims Sharp initiated many of the calls, sometimes more than one a day, and that the bulk of their discussions occurred in the immediate aftermath of the settlement. But he provided no details as to their substance beyond that outlined above.

34

On that motion record, the court concluded it could not exercise personal jurisdiction over Sharp. It had already determined that Kerby would have to be dismissed on the same ground, reasoning that he had no financial stake in the dispute, and so his mere preparation of documents, essentially as "just a puppet of Cimmer," did not constitute the requisite contact to keep him in the litigation.

Consequently, it concluded Sharp should be dismissed for lack of personal jurisdiction. It reached the same conclusion for the Future Now entities, but dismissed those entities without prejudice, specifically to afford Lunemann an opportunity to reinstate his claims against them, if discovery yielded a meaningful connection to the case and basis for jurisdiction. But Lunemann never did so.

On appeal, Lunemann does not directly quarrel with the merits of this decision when it was made, noting that the record had been "scant" at that early stage of litigation. He argues that the more "robust" one developed by the time of trial ultimately convinced the court of Sharp's intimate involvement in undermining the settlement and should warrant revisiting the issue of personal jurisdiction now.

In any event, the issue is moot, because Lunemann's lack of any viable avenue for recovery of additional damages renders the issue of no practical

A-4746-18

consequence. Lunemann already successfully prosecuted his claim for tortious interference against Cimmer and secured equitable enforcement of the interfered-with agreement and punitive damages. He has already been made whole in the first respect, and an award of punitive damages would not be available to him against Sharp absent a recovery of compensatory damages. Longo v. Pleasure Prods., Inc., 215 N.J. 48, 58 (2013).

Yet the only compensatory damages awarded against Cimmer for his tortious interference were reimbursement of plaintiffs' attorney fees, which were limited to those incurred past the May 2017 order. Lunemann alleges neither any inappropriate conduct on Sharp's part nor any harm Lunemann suffered after that order that would justify recovery from Sharp for any compensatory damages independent of what the court has already soundly rejected with respect to Cimmer. Notably, Lunemann does not even reply to this argument, even though he does so with respect to the remainder of Sharp's brief. Because Lunemann has therefore already been made whole, his challenge to Sharp's dismissal is moot, and we need not consider it. See Woodsum v. Twp. of Pemberton, 177 N.J. Super. 639, 643-44 (App. Div. 1981) (declining to consider a challenge to a dismissal of a claim and deeming issue moot, where plaintiffs already recovered by settlement with other defendant more than they would have been

A-4746-18

entitled had they been successful on claim).

## B. Civil Racketeering Claim

Lunemann next argues that he should have prevailed on his civil racketeering claim against Cimmer which the court effectively dismissed in the final judgment without any explicit discussion at all in the accompanying opinion. Lunemann argues he was entitled to judgment on this claim as a matter of law, obviating the need for any further formal factfinding. After reviewing the record, we conclude he plainly was not entitled to that relief.

Our racketeering statute provides in pertinent part:

> It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in or activities of which affect trade or commerce.
>
> [N.J.S.A. 2C:41-2(b).]

It defines "racketeering activity" as any of several enumerated criminal offenses, including "forgery and fraudulent practices and all crimes defined in chapter 21 of Title 2C of the New Jersey Statutes." N.J.S.A. 2C:41-1(a)(1)(o). The statute specifies, moreover, that a "pattern of racketeering activity" requires:

> (1) Engaging in at least two incidents of racketeering conduct one of which shall have occurred after the effective date of this act and the last of which shall have

37

occurred within [ten] years (excluding any period of imprisonment) after a prior incident of racketeering activity; and

(2)    A showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

[N.J.S.A. 2C:41-1(d).]

In addition to imposing criminal penalties, N.J.S.A. 2C:41-3, the statute authorizes "[a]ny person damaged in his business or property by reason of a violation" to recover in a civil suit "threefold any damages he sustains and the cost of the suit, including a reasonable attorney's fee, costs of investigation and litigation," N.J.S.A. 2C:41-4(c).

Lunemann argues that Cimmer, together with Sharp and Kerby, engaged in a pattern of racketeering activity comprising various instances of fraud, by knowingly creating and transmitting across state and international boundaries certain documents—specifically, the option and loan agreements and notice of Cimmer's exercise of his option—which falsely represented Lunemann as the owner of sixty shares of the Lodge, with the goal of acquiring majority control of that enterprise for Cimmer.

The court entertained the issue in the context of Cimmer's motion for a

directed verdict at the close of Lunemann's case, doubting the claim would prove successful, but concluding enough evidence had been presented for it to escape judgment as a matter of law. The court reasoned,

> it's too early for me to dismiss the [racketeering] claim. Is it a little bit of a stretch? I think it is a little bit of a stretch. I'll be honest with you, . . . I'm not seeing it as like, wow, this is really clear-cut as a traditional [racketeering] claim.
>
> . . . I'm just not prepared to dismiss it.

The court ultimately dismissed the claim in the final judgment without comment in either the order or accompanying opinion. Lunemann raises the issue on appeal, asserting that he was plainly entitled to prevail on the racketeering claim in light of his success on the tortious interference claim and the court's findings as to Cimmer's, Sharp's, and Kerby's concerted, fraudulent conduct. Yet, rather than requesting a remand for further consideration, he asks us to consider the issue in the first instance on appeal, conclude that he was entitled to judgment on the claim as a matter of law, and direct that he be awarded treble damages, attorney fees, and costs.

But Lunemann is not entitled to that particular relief, either as an inherent consequence of his success on the tortious interference claim or of the court's findings that he highlights on appeal. In the first respect, the elements of tortious

interference and those of the relevant racketeering violation do not coincide, except insofar as both broadly entail some manner of malfeasance.  Compare Printing Mart, 116 N.J. at 751-52, with N.J.S.A. 2C:41-2(b).  Success on a claim for the first does not inexorably compel success on a claim for the second.

The court did make findings in the course of its tortious interference discussion, but the court never explicitly found whether any of Cimmer's conduct in that regard constituted the outright criminal activity required for a racketeering violation, N.J.S.A. 2C:41-1(a)(1)(o), nor considered whether that conduct formed a "pattern" as contemplated by the statute, N.J.S.A. 2C:41-1(d).  Nor did the court ever explicitly consider whether Lunemann's acquiescence or participation in any of the offending conduct might preclude his recovery under the statute.  Cf. Off. Comm. of Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145, 1155 (11th Cir. 2006) (holding that federal statute did not permit recovery by party who "participated in the wrongdoing" that was subject of claim, reasoning that "[i]t would be anomalous, to say the least, for the [racketeering] statute to make racketeering unlawful in one provision, yet award the violator with treble damages in another provision of the same statute"); Rogers v. McDorman, 521 F.3d 381, 387-89 (5th Cir. 2008) (reaching same conclusion).

40

We discern no basis in the court's decision or underlying record to compel judgment as a matter of law on the racketeering claim. Although the court should have made explicit findings supporting its disposition of the claim, R. 1:7-4(a), because Lunemann does not request a remand for that relief and is not entitled to the only relief he does request, we affirm.

## C. Exclusion of Evidence

Lunemann contends the court abused its discretion in excluding evidence of ongoing economic damage he suffered from Cimmer's tortious interference with the CSA, specifically evidence related to his continued accumulation of debt. Lunemann testified at trial that he began accruing considerable credit card debt from his ordinary living expenses when he was laid off from Machine Drywall in 2009, kept up with interest payments for years in the hope of eventually "getting back on [his] feet at the sale of the [L]odge," but then fell behind on some payments just prior to the settlement. He stated that he intended to clear those debts with the money from the settlement, but that, because the settlement had not been promptly implemented due to Cimmer's interference, he had been forced to accrue an additional $60,000 in interest as of the trial and take out further loans in excess of $100,000 to pay for unspecified expenses. He sought damages for both.

41

During Cimmer's testimony on that point, the court noted that the settlement funds appeared insufficient to pay all of Lunemann's debt in addition to that on his credit cards, and it wondered aloud how it could determine without speculation which debts Lunemann would prioritize. Nor was it clear on this record how the court could assign liability for any damages. Lunemann, the court observed, had been "economic[ally] [u]nstable" even prior to the CSA, and

> he voluntarily didn't seek work from 2009 to 2011, when [the Lodge] started paying him . . . , when he wasn't getting paid through Machine [Drywall]. I have a spouse who is unemployed. I have a witness who is unemployed, living free in a house owned by somebody else, and they're not bugging him for rent.

Lunemann nonetheless completed his testimony, though the court ultimately did not explicitly address this element of damages in its opinion or final judgment. Lunemann has somewhat revised his story on appeal, with no viable citation to the record. Lunemann's sole argument on this point on appeal is that the court improperly excluded his testimony and supporting evidence on the issue. But our review of the record finds no decision to exclude the evidence and the court clearly heard the relevant testimony and was never asked and never made any ruling to exclude any of it. To the extent, however, that Lunemann's argument can be read to quarrel with the court's apparent decision to discredit or otherwise discount his testimony, that was its prerogative as finder of fact.

42

<u>Cesare</u>, 154 N.J. at 412.

## D. Charging Lien

Lunemann next argues that the court abused its discretion in giving precedence to the Niessners' setoff, reflecting the attorney's fee award and other reimbursements required by the judgment, over his counsel's charging lien.

As a preliminary matter, the application to enforce the lien and establish its precedence over the setoff was appropriately made below by Giansante, not by Lunemann. The firm did not appeal from that ruling or seek to intervene, and it is not clear Lunemann has standing to assert its interests.

With respect to the primary issue, the charging lien is authorized by our Attorney's Lien Act, N.J.S.A. 2A:13-5, which provides:

> After the filing of a complaint or third-party complaint or the service of a pleading containing a counterclaim or cross-claim, the attorney or counsellor at law, who shall appear in the cause for the party instituting the action or maintaining the third-party claim or counterclaim or cross-claim, shall have a lien for compensation, upon his client's action, cause of action, claim or counterclaim or cross-claim, which shall contain and attach to a verdict, report, decision, award, judgment or final order in his client's favor, and the proceeds thereof in whosesoever hands they may come. The lien shall not be affected by any settlement between the parties before or after judgment or final order, nor by the entry of satisfaction or cancellation of a judgment on the record. The court in which the action or other proceeding is pending, upon the petition of the

A-4746-18

attorney or counsellor at law, may determine and enforce the lien.

The law is meant to "protect attorneys who do not have actual possession of assets against clients who may not pay for services rendered." Martin v. Martin, 335 N.J. Super. 212, 222 (App. Div. 2000).

The statute does not address the priority of the lien, but our courts have long typically given it precedence over a setoff, at least one for another subsequent judgment, often on the notion that the earlier lien should be given priority. See Terney v. Wilson, 45 N.J.L. 282, 283-84, 288 (Sup. Ct. 1883) (setoff for judgment in another matter not assigned to defendant until after judgment in subject litigation); Phillips v. Mackay, 54 N.J.L. 319, 323-25 (1892) (judgment arising from same cause of action but obtained in another jurisdiction); Seaman v. Mann, 114 N.J. Eq. 408, 409-10 (Ch. 1933) (prior judgment in another matter not assigned to defendant until after verdict in subject litigation); see also Sagi v. Sagi, 386 N.J. Super. 517, 525 (App. Div. 2006) (noting that relative priority of liens ordinarily determined by "basic rule" of "first in time, first in right").

Above all, a charging lien is "rooted in equitable considerations, and its enforcement is within the equitable jurisdiction of the courts." Martin, 335 N.J. Super. at 222. In Phillips, the Court compared the attorney's and defendant's

44

relative interests to conclude that "equity . . . require[d] that [the defendant's] demand against the plaintiff be subordinated to the claim of the attorney." 54 N.J.L. at 324-25. More recently, in considering the priority of an attorney's lien on net proceeds from the sale of marital property in a divorce matter, albeit not over a setoff from another judgment, we observed that the firm there "proceed[ed] on the mistaken understanding that its imposition of a statutory lien g[ave] it a boost up the claimant totem pole," elucidating:

> The lien merely precludes the disposition of the fund in question—or allows that lien to remain attached to the proceeds of the client's claim "in whose hands they may come," N.J.S.A. 2A:13-5—without first a consideration of the attorney's claim. As the Supreme Court has explained, the assertion of the lien is "'only a claim of right to ask for the intervention of the court' for the attorney's 'protection, when, having obtained judgment for his client, there is a probability of the client depriving him of his costs.'"
>
> With the imposition of an attorney's lien, the court that rendered the award, judgment or order to which the lien attached must determine which claimant possesses the higher priority to the fund. And to make that decision, the court must weigh the competing equities.
>
> [Ippolito v. Ippolito, 465 N.J. Super. 428, 433-34 (App. Div. 2020) (quoting Republic Factors, Inc. v. Carteret Work Unifs., 24 N.J. 525, 534 (1957)).]

Here, the final judgment permitted the Niessners to "[offset] any amounts due from the Lodge to Lunemann under the CSA against any damages or

45

monetary sanctions [otherwise] awarded to them against Lunemann" in the judgment. On the ensuing motions, including Giansante's to enforce its lien against Lunemann's recovery under the settlement and to establish its priority over any setoff by the Niessners, the court issued its clarification order calculating plaintiffs' setoff as $182,755.30, and determining, without elaboration:

> As the settlement agreement calls for the payment of $354,000.00 . . . to Lunemann by Keeley, as soon as the funds are made available to the Lodge by the [c]ourt in Canada, Lunemann is to be paid the remainder of $171,244.70, subject only to the charging lien of Giansante . . . , should it remain outstanding at that time.

On appeal, Lunemann reiterates his counsel's position that, because the lien attached to the settlement, which was achieved before any of the claims in the continued litigation even arose, it should take priority over any subsequent judgment on those claims. He reasons that the lien was therefore first in time and should not be displaced as a result of his own conduct a week later, which he undertook without his counsel's advice or even knowledge. He asserts the setoff was improper because the judgment representing the setoff was awarded to different parties—the Niessners—than the one responsible for payment of the settlement that it was set off against—the Lodge.

46

But that is a distinction with no consequence.  The Niessners and the Lodge are certainly different parties, but they shared representation throughout this litigation by counsel whose fee reimbursement accounted for the bulk of the setoff.  Moreover, the Niessners loaned the Lodge considerable money during the course of the litigation.  Like enforcement of a charging lien, application of a setoff is a matter of equity, <u>Kristeller v. First Nat'l Bank</u>, 119 N.J.L. 570, 572 (1938), and Lunemann makes no compelling argument that the setoff was inequitable here.

As for the charging lien, the parties may well have reached a settlement of their initial dispute before the balance of the claims in this litigation even arose, but it remains they arose before the settlement was the subject of any formal order and were resolved in the context of the same litigation.

E.  Punitive Damages

Lunemann next challenges the adequacy of his punitive damage award against Cimmer.

Punitive damages, sanctions awarded separately from compensatory damages to punish or deter "particularly egregious conduct," are meant to be a "limited remedy and must be reserved for special circumstances." <u>Maudsley v. State</u>, 357 N.J. Super. 560, 590-91 (App. Div. 2003).  Consequently, our

47

Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17, permits recovery of such sanctions only on proof, "by clear and convincing evidence, that the harm suffered was the result of the [adverse party]'s acts or omissions, and [that] such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by [them]." N.J.S.A. 2A:15-5.12(a).

But, in the end, a fair and appropriate award must depend on a "consideration of all relevant circumstances," Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. 329, 338 (1993), including "any mitigating circumstances which may operate to reduce the amount of the damages," Leimgruber v. Claridge Assocs., 73 N.J. 450, 456 (1977) (emphasis added). A court's decision whether and in what amount to award punitive damages rests within its sound discretion and will be reviewed on appeal only for an abuse of that discretion. Maudsley, 357 N.J. Super. at 590.

Here, the court found the Niessners and Lunemann had introduced ample evidence to establish that Cimmer's actions met the requirement of "actual malice." It recounted that he knew the terms of the CSA and the harm that would befall the Niessners by inducing Lunemann to breach it and forcing the Niessners into further litigation. Moreover, he continued this course of conduct

despite the court's rulings that the agreements between him and Lunemann were void ab initio, and even held himself out as owner of the Lodge by registering his ownership interest and advertising for a manager. Noting his track record of "repeatedly thumb[ing] his nose at the [court's] authority," the court doubted he would comply with any further orders issued either here or in Canada, where he continued to pursue litigation, and concluded that punitive damages were warranted.

The court's decision includes no explicit reasoning particular to its selection of the $5,000 figure, but Lunemann does not challenge the award on that ground. He asserts on appeal only that the award was inadequate either to punish Cimmer for his past intimidation and fraud, which had caused Lunemann to "los[e] nearly everything," or to deter Cimmer from engaging in the same mischief in the pursuit of Canadian litigation that Lunemann also cannot afford. On the contrary, the court explicitly found, based on sufficient credible evidence in that record, numerous mitigating factors warranting a limited award after examining the conduct of both Cimmer and Lunemann.

The court's consequent decision to award only $5,000 in punitive damages therefore finds adequate support in the record and fell well within its discretion. See Leimgruber, 73 N.J. at 456 (noting relevance of mitigating factors to setting

an appropriate award).

## F.  Excessiveness of Damages

Lastly, Lunemann contends that the damages awarded against him were excessive and urges that the judgment be vacated in that respect.  Specifically, Lunemann takes issue with three offsets the court required to be made to the $354,000 he was due from the Lodge under his settlement with plaintiffs—reimbursements to the plaintiffs for one third of the receiver fees and one quarter of their attorney fees, and an effective reimbursement to Cimmer for the $30,698.48 Cimmer had advanced him to fund this litigation.  As already addressed above in the context of Cimmer's appeal, the court assigned responsibility for the receiver fees equally, presumably as a matter of equity, and apportioned the attorney fee award between Cimmer and Lunemann according to their respective blame for prolonging the litigation.  It offered no rationale particular to the reimbursement for Cimmer's loan in the final decision or judgment, though that reimbursement had long been a term of the CSA the court enforced at Lunemann's urging.  Indeed, the agreement explicitly provided that funds be held in escrow from the amount due to Lunemann for purposes of satisfying that loan obligation.

On appeal, Lunemann argues that Cimmer should have forfeited any claim

to repayment as a result of his "malicious actions."  As for Lunemann's share of the receiver and attorney fees, he neither makes any legal challenge to those awards as Cimmer had, nor disputes any of the facts underlying the court's decision.  He argues only that his course of conduct in this litigation should be excused as a matter of equity in light of the difficult position he found himself— caught between the Niessners and Cimmer in their battle over the lodge.

But the court found, based on sufficient evidence substantiating a course of conduct Lunemann does not dispute, Rova Farms Resort, 65 N.J. at 483-84, that, rather than being completely helpless, as he now portrays himself on appeal, he had consistently played both sides to his own advantage in this litigation.  That well-grounded finding, moreover, leaves him in a poor position to assert that he should be excused from repayment of funds he deliberately borrowed and undisputedly never repaid.  See Pellitteri, 266 N.J. Super. at 65 (explaining unclean hands doctrine and noting that application aimed at achieving justice).  In any event, repayment of those funds was an explicit term of the settlement agreement Lunemann successfully urged the court to enforce, and he cannot advocate for a different result now.  See Brett v. Great Am. Recreation, 144 N.J. 479, 503 (1996) (discussing invited error doctrine).

In sum, we perceive no basis to second-guess the court's factual and

credibility findings or conclusions of law. To the extent we have not addressed Cimmer's or Lunemann's remaining arguments, we are satisfied they are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4746-18